**CONOCO, INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 79–3419.

United States Court of Appeals,
Fifth Circuit.

July 30, 1980.

Thomas H. Burton, Carolyn S. Hazel, Houston, Tex., for Conoco Inc.

Martin N. Erck, Exxon Corp., Houston, Tex., Bernard A. Foster, III, Ross, Marsh & Foster, Washington, D. C., Jeron L. Stevens, Baker & Botts, Houston, Tex., for Exxon Corp.

Kenneth L. Riedman, Jr., Victor E. Fitzmaurice, Los Angeles, Cal., for Union Oil Co. of California.

Paul J. Broyles, John A. Ramsey, Karen A. Berndt, Houston, Tex., for Texaco, Inc.

Lauren L. Eaton, Houston, Tex., for Gulf Oil Corp.

Phyllis Rainey, Michael B. Silva, Tenneco Oil Co., Houston, Tex., for Tenneco Oil Co.

Jerome M. Feit, Elias G. Farrah, Jerome Nelson, Sol., Washington, D. C., for Federal Energy Regulatory Commission.

Frederick Moring, Jennifer Waters Hitt, Washington, D. C., for Associated Gas Distributors.

Before CHARLES CLARK, RONEY and GARZA, Circuit Judges.

RONEY, Circuit Judge:

Here the parties quarrel over whether gas from the Outer Continental Shelf, which was subject to lease but had not commenced flowing on the determinative date set by the new Natural Gas Policy Act, was exempted by that Act from the regulatory provisions of the old Natural Gas Act. The effect of the exemption would eliminate the requirement of obtaining a certificate of public convenience and necessity, and remove the gas from the regulatory controls over sales and uses of the gas and the abandonment or curtailment of service. The exemption would also mean that the gas would be freed from price controls after 1985, although it will be subject to price controls until then, in either event.

The decision turns on the definition to be applied to certain words in the exempting provision of the Natural Gas Policy Act: "committed or dedicated to interstate commerce." The owners of the leases, not wanting to be subject to the Natural Gas Act regulations, contend that these words should be defined in the same way that "dedication of gas to interstate commerce" was defined by judicial decision under the

Natural Gas Act. Under that definition, gas was not "dedicated" until it actually commenced flowing in interstate commerce. If so defined the gas here, which had not commenced flowing, would be exempt. The intervenors, a number of gas purchasers wanting the gas subject to the Natural Gas Act, would define those words as they are defined in the definitional section of the new Natural Gas Policy Act, which says that the phrase "committed or dedicated to interstate commerce" means, among other things, "natural gas which is from the Outer Continental Shelf." The Commission agreed with the intervenors, holding that Congress intended not to exempt so-called "old lease" Continental Shelf gas, whether or not it had commenced flowing under those leases, from the certification requirements of the Natural Gas Act, and intended to exempt only so-called "new lease" gas. That contest and the Commission's decision present the issue for this review. We affirm the Commission.

The Federal Energy Regulatory Commission (FERC) denied the petitions of Conoco, Inc. and Exxon Corp. (jointly referred to as Conoco) seeking a declaration that a certificate under the Natural Gas Act of 1938 (NGA) is not required for sales of natural gas produced from "old" Outer Continental Shelf (OCS) leases where no interstate deliveries of production under the leases had commenced prior to enactment of the Natural Gas Policy Act of 1978 (NGPA). The Outer Continental Shelf leases here involved were entered into prior to April 20, 1977. Under section 2(9) and (10) of NGPA, 15 U.S.C.A. § 3301(9) and (10), these are deemed "old" leases. There has been no production of natural gas from these leases at present.

Section 601(a) of NGPA, 15 U.S.C.A. § 3431(a), exempts certain categories of natural gas from the jurisdiction of FERC and the requirement of obtaining a certificate of public necessity under NGA. "New natural gas," which includes gas from "new" OCS leases executed after the critical date, is exempt under section 601(a)(1)(B)(ii). The question in this case is

whether the gas from "old" leases which had not flowed prior to the enactment of NGPA is exempt under section 601(a)(1)(A). That section provides:

For purposes of Section 1(b) of the Natural Gas Act, effective on the first day of the first month beginning after the date of the enactment of this Act, the provisions of the Natural Gas Act and the jurisdiction of the Commission under such Act shall not apply to natural gas which was not committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act solely by reason of any first sale of such natural gas.

Section 2(18) of NGPA, 15 U.S.C.A. § 3301(18), states in plain language that the "term 'committed or dedicated to interstate commerce', when used with respect to natural gas, means—(i) natural gas which is from the Outer Continental Shelf . . ." We probably could end this discussion by merely holding that the definition section of the controlling Act being plain, the Commission must be upheld under the well-settled general rule that "[w]hen a legislature defines the language it uses, its definition is binding upon the court." 1A Sutherland, Statutes & Statutory Construction § 20.08, at 59 (4th ed. C. Sands 1973). To be thorough, however, we shall examine each of Conoco's contentions as to why the definition in section 2(18) does not apply to section 601(a)(1).

The language of section 601(a)(1), says Conoco, makes it clear that the decisive question is whether the gas was committed or dedicated to interstate commerce as of the day before the date of the enactment of NGPA. The section 2(18) definition was not in existence on the day before the enactment of NGPA, Conoco argues, so it is therefore apparent that Congress intended that the well-established definition under the NGA—which did exist on the day before the date of enactment—must apply. That definition—natural gas did not become committed or dedicated to interstate commerce until the commencement of interstate deliveries of such gas—should be used

in section 601(a)(1). *See Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 387–89, 79 S.Ct. 1246, 1253–1254, 3 L.Ed.2d 1312 (1959).

Even though the section 2(18) definition had not been enacted on the day prior to enactment, Conoco's argument lacks merit. A statute or a definition contained within it may draw upon antecedent facts for its operation. *See Savorgnan v. United States*, 338 U.S. 491, 504 n. 21, 70 S.Ct. 292, 299, 94 L.Ed. 287 (1950); *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922); *Patagonia Corp. v. Board of Governors*, 517 F.2d 803, 810–12 (9th Cir. 1975). The language "committed or dedicated to interstate commerce" is used several times in NGPA and apparently is never used without reference either to "the day before the date of enactment." November 8, 1978, or to April 20, 1977. *See, e. g.*, §§ 104(a), 105(a), 106(a), 109(a)(2), 121(a)(2)(A), 122(d)(2)(A), 315(b)(1) (15 U.S.C.A. §§ 3314(a), 3315(a), 3316(a), 3319(a)(2), 3331(a)(2)(A), 3332(d)(2)(A), 3375(b)(1)). It is thus quite clear that Congress intended to rely on antecedent facts in determining whether gas was "committed or dedicated to interstate commerce" under NGPA, and intended for the definition to be applicable as if it were in force prior to the effective date of the Act.

Conoco also relies on *Lawson v. Suwanee Fruit & Steamship Co.*, 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949), which held that when use of the statutory definition creates "obvious incongruities in the language" and destroys "one of the major purposes" of the legislation, it should not be mechanically applied. 336 U.S. at 201, 69 S.Ct. at 504. In this case, it is contended, use of the statutory definition creates incongruity because it renders the "day before the date of enactment" test date meaningless and it frustrates one of the major purposes of the legislation, which is that this gas should not be subject to FERC's jurisdiction and the resulting regulatory burden.

FERC's construction does not create an "obvious incongruity" in the statute by

making meaningless the day before the date of enactment test date. Although the test date has little effect on OCS gas, due to section 2(18)'s inclusion of all OCS gas within its definition, the test date has a significant impact on non-OCS gas. Since some non-OCS gas may not come within section 2(18)'s definition of "committed or dedicated to interstate commerce" prior to the day before the date of enactment, it will not become subject to FERC's jurisdiction by reason of a first sale.

In support of its contention that FERC's construction thwarts one of the Act's major purposes, Conoco cites the following language of the House conferees.

The conference agreement limits the jurisdiction of the Commission under the Natural Gas Act in a manner similar to the House-passed bill.

Natural gas not committed or dedicated to interstate commerce on the day before the date of enactment of this Act is never made subject to the Commission's jurisdiction under sec. 1(b) of the Natural Gas Act.

H.R.Rep. No. 1752, 95th Cong., 2d Sess. 123, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 8983, 9039–40. This language, Conoco argues, makes it clear that Congress did not intend to subject to FERC jurisdiction OCS gas not flowing on the day before the date of enactment. That argument, however, begs the question. The question of FERC's jurisdiction cannot be answered independent of a determination of the definition of "committed or dedicated to interstate commerce," which brings us back to the starting place. It is clear from section 601 that Congress intended to free certain natural gas from FERC jurisdiction while leaving other gas subject to that jurisdiction. In deciding that certain gas is subject to its jurisdiction, FERC does not thwart any of the Act's major purposes.

Conoco cites other portions of the legislative history to bolster its position. It places particular reliance on the following passage:

With respect to natural gas from the Outer Continental Shelf that is not subject to a certificate of public convenience and necessity under the Natural Gas Act on the date of enactment, the term "committed or dedicated to interstate commerce" is used solely for the purpose of the pricing and other provisions of this Act. This definition does not create new freestanding obligations or expand the jurisdiction of the Commission under the Natural Gas Act.

H.R.Rep. No. 1752, 95th Cong., 2d Sess. 123, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 8983, 8988. Applying the section 2(18) definition to section 601(a)(1) expands FERC's jurisdiction, says Conoco, contrary to this express congressional statement.

It is difficult to perceive how failure to exempt certain gas from NGA's regulations is an expansion of FERC's NGA jurisdiction, and we reject the contention that it is. The quoted statement does not provide the support Conoco ascribes to it, and in fact is consistent with FERC's construction. The reference to "pricing and other provisions of this Act" is broad enough to encompass section 601(a)(1): The correct import of the passage, we believe, is to state that the term in quotation marks is used as a term of art in NGPA and the definition is used solely for purposes of that Act and is not intended to expand the enormous body of case law concerning "interstate gas."

Conoco also relies on a letter from Secretary of Energy Schlesinger to Senator DeConcini, reported in 124 Cong. Rec. S16254 (daily ed. Sept. 27, 1978).

First, the wellhead pricing provisions of the bill will lead to a significant reduction in the regulatory burdens under the Natural Gas Act of 1938. For virtually all new wells, producers selling in interstate commerce will not be required to file, and the FERC will not be required to process, certificate applications, rate increase filings, or abandonment applications or to conduct rate determination proceedings. The vast majority of FERC's current caseload deals with producer regulation. For example, the projected 1979 caseload for the Commission is 47,522 cases and

producer certificates and rate filings under the Natural Gas Act constitute 81 percent or 37,682. Those types of cases would be eliminated for the future.

Secretary Schlesinger's statement that "virtually all new wells" would not be subject to FERC nonpricing regulations is not inconsistent with the view that FERC would continue to process some certificate applications, especially in view of the statutory scheme. The statement does not compel the result Conoco seeks.

Perhaps more relevant is the statement of Representative Dingell and four other members of the House Conference Committee, reported in 124 Cong. Rec. H13117 (daily ed. Oct. 14, 1978).

> There has been some discussion whether "new reservoirs" on "old OCS leases" in the Baltimore Canyon would be deregulated under the Natural Gas Policy Act. . . . *However, such gas would not be deregulated for pricing or non-pricing purposes.*
>
> On the other hand, "new gas," that is, gas produced from a "new lease" as defined under section 102(c), would be deregulated for pricing purposes under section 121(a)(1) as of January 1, 1985. This category of gas would also be deregulated for non-pricing purposes under section 601(a)(1)(B)(ii), effective as of the first day of the first month beginning after date of enactment.

(Emphasis added). This statement shows that FERC's construction of the Act is fully consistent with Congress' intent.

■ We conclude the general rule that the definition supplied by the legislature should be used is applicable here and that the resulting construction is consistent with the legislative intent. Accordingly, we affirm FERC's denial of the declaration sought.

AFFIRMED.